BID PROCEDURES HEARING DATE: JANUARY 19, 2016
BID PROCEDURES HEARING TIME: 11:00 A.M.

SALE HEARING DATE:  TBA
SALE HEARING TIME:  TBA

TARTER KRINSKY & DROGIN LLP
*Proposed Attorneys for NYC Constructors Inc., et al.*
*Debtors and Debtors-in-Possession*
1350 Broadway, 11th Floor
New York, New York 10018
(212) 216-8000
Scott S. Markowitz, Esq.
Arthur Goldstein, Esq.
Rocco Cavaliere, Esq.

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------- x

| | | |
|---|---|---|
| In re: | : | |
| | : | Chapter 11 |
| NYC Constructors Inc., et al.,[1] | : | |
| | : | Case No.: 16-10069 (SCC) |
| Debtors. | : | |

-------------------------------------------------------------- x

**DEBTORS' MOTION FOR ORDERS PURSUANT TO SECTIONS 105(a) AND 363(b), 363(f), 363(m) AND 365 OF THE BANKRUPTCY CODE AND BANKRUPTCY RULES 6004 AND 6006 (I) AUTHORIZING AND APPROVING ENTRY INTO A STALKING HORSE PURCHASE AGREEMENT AND GRANTING BID PROTECTIONS TO THE STALKING HORSE PURCHASER, AND (II) APPROVING (A) BID PROCEDURES AND NOTICE OF THE AUCTION RELATING THERETO, (B) SALE OF SUBSTANTIALLY ALL OF THE DEBTORS' ASSETS (INCLUDING THE ASSUMPTION AND ASSIGNMENT OF EXECUTORY CONTRACTS) TO THE STALKING HORSE PURCHASER OR A PARTY MAKING A HIGHER AND BETTER OFFER, FREE AND CLEAR OF LIENS, CLAIMS, INTERESTS AND ENCUMBRANCES, (C) APPROVING THE ASSET PURCHASE AGREEMENT WHICH MAY INCLUDE A CREDIT BID COMPONENT, AND (IV) GRANTING RELATED RELIEF**

TO:    THE HONORABLE SHELLEY C. CHAPMAN

---

[1] The Debtors in these chapter 11 cases and the last four digits of each Debtor's federal tax identification number are NYC Constructors Inc. (7618) and MRP, L.L.C. (0498).

UNITED STATES BANKRUPTCY JUDGE

NYC Constructors Inc. ("NYC Constructors") and MRP, L.L.C. ("MRP") as debtors and

debtors-in-possession (collectively, the "Debtors" or "Sellers"), hereby move this Court (the

"Sale Motion"):  (i) for the entry of an order (the "Bid Procedures Order") pursuant to 11 U.S.C.

§§ 105(a), 363 and 365, Rules 6004 and 6006 of the Federal Rules of Bankruptcy Procedure,

Rule 6004-1 of the Local Bankruptcy Rules for the Southern District of New York and pursuant

to the amended guidelines adopted by General Order M-383 (a) authorizing the Debtors to enter

into, and approving the form of, that certain asset purchase agreement (together with the related

sale documents, the "Stalking Horse Purchase Agreement" or "APA") for  the sale (the "Sale")

of substantially all of the Debtors' assets to Banker Steel NY, LLC and Banker Steel NJ, LLC

(collectively, "Banker Steel", or "Stalking Horse Purchaser"), as more particularly described in

the Stalking Horse Purchase Agreement, (b) approving the bidding procedures (the "Bid

Procedures"), break-up fee and expense reimbursement, including granting administrative

expense status to the break-up fee and expense reimbursement; (c) scheduling an auction (the

"Auction") (if a qualified competing bid (other than the Stalking Horse Purchaser's) is timely

received) and a sale hearing, and (d) approving the form of notice of such Sale Procedures and

Bid Procedures, the Auction and the Sale; and (ii) after completion of the Sale Hearing, entry of

an order (the "Sale Order") pursuant to 11 U.S.C. §§ 105(a), 363 and 365 and Rules 6004 and

6006 of the Federal Rules of Bankruptcy Procedure (a) authorizing and approving the Sale to

Buyer or to another qualified bidder submitting a higher or otherwise better offer (the

"Successful Bidder") free and clear of all liens, claims, encumbrances and interests, (b)

approving the Stalking Horse Purchase Agreement, (c) authorizing the assumption and

assignment of certain executory contracts, and (d) granting related relief.  In support of the Motion, the Debtors respectfully state as follows:

## PRELIMINARY STATEMENT

1.      By this Motion, the Debtors seek to sell substantially all of their assets (the "Assets") for a total consideration of at least$7,200,000, which includes a cash purchase price of approximately $7 million[2] and the assumption of certain liabilities of approximately$200,000, to Banker Steel (or such entity that submits a higher bid), and establish procedures for the sale, including approval of bid procedures and bid protections to the Stalking Horse Purchaser.

The Stalking Horse Purchaser is a competitor of the Debtors in the structural steel fabrication industry with steel fabrication facilities in Lynchburg, Virginia and Orlando, Florida.  As discussed below, the Stalking Horse Purchaser has presented the Debtors with a fair and appropriate offer to purchase substantially all of the Debtors' assets as a going concern, including hiring all or substantially all of the Debtors' current employees.

## JURISDICTION AND VENUE

2.      The Court has jurisdiction over this Motion pursuant to 28 U.S.C. §§ 157 and 1334.  Venue of this proceeding is proper in this district and before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.  This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2).

3.      The statutory predicates for the relief requested herein are 11 U.S.C. §§ 105(a), 363 and 365, Rules 2002, 6004, 6006 and 9014 of the Federal Rules of Bankruptcy Procedure

---

[2] As described in more detail below, the cash purchase price is comprised of $3 million to satisfy in full all obligations owed under the DIP Facility (as defined below), $2 million to satisfy all amounts owed to the Debtors' prepetition secured lender, and an additional $2 million in cash.  The DIP Lender and the Prepetition Secured Lender (as such terms are defined below) are both affiliates of the Stalking Horse Purchaser, and pursuant to the APA, in lieu of a cash payment for such obligations, the Stalking Horse Purchaser has the option to credit bid or assume these respective liabilities.

(the "Bankruptcy Rules"), and Rule 6004-1 of the Local Bankruptcy Rules for the Southern District of New York (the "Local Bankruptcy Rules"). The Debtors also rely upon the amended guidelines adopted pursuant to General Order M-383.

## GENERAL BACKGROUND

4.      On January 14, 2016 (the "Petition Date"), NYC Constructors and MRP commenced their chapter 11 cases by filing voluntary petitions for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code"), in the United States Bankruptcy Court of the Southern District of New York (the "Bankruptcy Court" or "Court"). The Debtors intend to continue in possession of their properties and operating their businesses as debtors in possession in accordance with Bankruptcy Code sections 1107 and 1108. Further, to enable the Debtors to minimize any adverse effects of the chapter 11 filings on their businesses, the Debtors intend to request various types of relief in certain "first day" applications and motions (collectively, the "First Day Motions").

5.      No trustee or committee of creditors has been appointed in the Debtors' cases.

**A.      THE DEBTORS' BUSINESSES, CORPORATE HISTORY, AND CAPITAL STRUCTURE**

6.      NYC Constructors is a corporation organized under the laws of the State of New York with its principal office at 110 East 42nd Street, Suite 1502, New York, NY 10017. NYC Constructors is engaged in the structural steel installation business and its primary assets consist of construction equipment and steel inventory acquired from DCM Erectors Inc., a well-known steel erector which performed all of the structural steel installation at the new World Trade Center Tower One. MRP is a New Jersey limited liability company, and a wholly-owned subsidiary of NYC Constructors, with its principal office at 1640 New Market Avenue, South Plainfield, New Jersey 07080. MRP is engaged in the steel fabrication industry and fabricates structural steel for large-

scale construction projections for NYC Constructors, as well as other well-known structural steel installers.

7.      The Debtors currently employ a total of approximately 310 employees (most of which are union iron workers).  NYC Constructors has approximately 253 employees and MRP has approximately 57 employees.  Both Debtors outsource some of their back office work to a non-debtor affiliate Canadian company owned by B. King Construction Management Inc.  (the Debtors' principal, Barry King, is the sole owner of B. King Construction Management Inc.), which provides engineering, drafting, and accounting services to the Debtors.  NYC Constructors pays, on a bi-monthly basis, to its non-debtor affiliate amounts necessary to cover its costs, including all payroll.

8.      The Debtors are privately held entities.  NYC Constructors owns 100% of the membership interest in MRP.  Barry King, through his wholly-owned company, B. King Construction Management Inc., owns all of the stock in NYC Constructors.  Banker Steel Co., L.L.C. ("Prepetition Secured Lender" or "DIP Lender", as applicable) holds a first priority security interest in substantially all of the Assets of the Debtors under a Promissory Note and Security Agreement.   On the Petition Date, the Prepetition Secured Lender was owed approximately $2,000,000 in principal amount, plus accrued interest.  As of the Petition Date, the Debtors also owe less than $3,000,000 to various creditors such as trade vendors, union pension and welfare funds, subcontractors, materialmen, and other parties.

## B.      EVENTS LEADING TO THE CHAPTER 11 CASES

9.      The events leading to the filing of these cases has been detailed in the Declaration of Barry King (I) In Support of Debtors' First Day Motions And (II) Pursuant to Local Bankruptcy Rule 1007-2 (the "First Day Declaration") filed concurrently with the original petitions, and is referred to as if fully set forth herein.  In short, the Debtors' chapter 11 cases were filed to preserve

the Debtors' operations and the value of the Debtors' assets through a sale of substantially all of the Debtors' assets. The Debtors, in the exercise of their business judgment, have determined that due to the Debtor's pressing liquidity issues and their need to prevent disruption on their ongoing construction projects, it is in the Debtors' best interests to proceed with a prompt Sale of the Assets at this time, in order to preserve and maximize the going concern value of their assets and operations for the benefit of their creditors, vendors and employees.

### C.     ASSETS

10.     Pursuant to the Sale Motion, the Debtors seek approval of the sale (the "Sale") of substantially all of the assets necessary to the operation of the businesses, and certain claims and liabilities to be assumed by Banker Steel, all as more fully set forth in the APA (collectively, the "Assets") attached hereto as **Exhibit "A"**. Under the Stalking Horse Purchase Agreement, the total consideration to be paid by Banker Steel to Debtors for the Assets will be the sum of approximately $7,200,000, including $2,000,000 cash, plus approximately $2,000,000 cash to satisfy in full the $2 million secured loan (plus accrued interest) made by the Prepetition Secured Lender to the Debtors on January 7, 2016 (the "Prepetition Loan") and approximately $3,000,000 cash to satisfy all amounts due under a postpetition financing facility made by the DIP Lender to the Debtors, plus the assumption of the Assumed Liabilities (as defined in the APA). The Stalking Horse Purchaser has, however, the option to credit bid or assume the Prepetition Loan and the obligations under the DIP Facility.

### D.     DIP FINANCING MOTION

11.     The Debtors have filed concurrently with this Sale Motion their Motion for Interim and Final Orders (I) Authorizing Debtors to Obtain Postpetition Financing Pursuant to Section 364 of the Bankruptcy Code, (II) Authorizing Use of Cash Collateral Pursuant to Section 363 of the Bankruptcy Code, and (III) Granting Related Relief (the "DIP Financing Motion").

The Debtors will have negative cash flow and will be unable to continue operating if the DIP Financing Motion is not granted and will be able to maintain operations only if the DIP Financing Motion is granted. Under the DIP Financing Motion, the DIP Lender will provide a revolving loan facility to fund the Debtors' general corporate and working capital expenses, including payroll, in the amount of up to $3,000,000 pursuant to an agreed upon budget (the "DIP Facility"). The Debtors' projections show that even this substantial additional liquidity will likely be exhausted by early May, 2016. This critical dynamic, among other factors, drives the timing of the Debtors' requests regarding this Sale Motion and the proposed Bid Procedures.

### E.    PREPETITION MARKETING EFFORT

12.    The Debtors commenced the process of evaluating restructuring and sale options in the summer of 2015. On or about October 23, 2014, NYC Constructors entered into a Trade Agreement with Tishman Construction Corporation ("Tishman Construction"), whereby NYC Constructors performed structural steel erection and metal deck/shear stud installation at the World Trade Center 3 Tower (the "WTC3 Project").[3] By the fall of 2015 it became evident that the cost to complete the WTC3 Project would result in a loss to NYC Constructors in excess of $15 million dollars and that NYC Constructors did not have the financial means to complete the WTC3 Project. Further, the Construction Manager for the WTC3 Project at that time advised NYC Constructors that it was in default and that additional funding might not be available absent a satisfactory resolution. At the same time, the Debtors' liquidity difficulties threatened to jeopardize NYC Constructors' other projects and MRP's ability to provide timely steel fabrication services to NYC Constructors and its other customers. Around this time, the Debtors initiated negotiations with Banker Steel to purchase the Assets. Given the Debtors' financial

---

[3] Silverstein Properties is the owner of the WTC3 Project and Tishman Construction is the construction manager for the WTC3 Project.

difficulties, the Debtors determined that the only viable manner by which it could maintain and maximize the value of its going concern operations, was through a bankruptcy court approved sale transaction.

13.     On December 9, 2015, the Debtors hired Getzler Henrich & Associates LLC ("Getzler Henrich") as restructuring advisors and William Henrich as chief restructuring officer to assist the Debtors in their restructuring efforts, including negotiating a sale of the Assets and navigating the chapter 11 process as well as identifying strategic buyers for the Assets.

14.     The Debtors' management and Getzler Henrich have had in-depth discussions with Banker Steel management and their advisors for the last few months.   The Debtors concluded that Banker Steel was the party that offered the greatest value for the Debtors' Assets, it had the financial wherewithal to provide both prepetition and postpetition financing as well as assist the Debtors in obtaining bonding for current jobs and was in a position to move quickly to a transaction in light of the Debtors' difficult financial circumstances.   On January 14, 2016, the Debtors entered into the APA with Banker Steel subject to Bankruptcy Court approval and higher and better bids.    In connection therewith, the DIP Lender also agreed to provide the Debtors with the DIP Facility that will enable the Debtors to maintain normal course operations and fund their bankruptcy expense pending approval of the auction and sale process.

**F.      THE PROPOSED SALE**[4]

15.     The Debtors and Banker Steel negotiated the APA that provides that Banker Steel will serve as a Stalking Horse Purchaser to facilitate a sale pursuant to Bankruptcy Code §§ 363(b) and (f).

16.     The salient terms of the APA entered into by and between the Debtors and Banker

---

[4] The summary of the APA is provided for convenience only and is qualified in its entirety by the specific terms of the APA.  To the extent that there is any discrepancy, the terms and conditions of the APA shall control.

Steel are summarized in Paragraph30, below. Banker Steel has offered to (a) pay $7 million in cash, subject to the right to credit bid or assume the amounts owed to the Prepetition Secured Lender and the DIP Lender instead of paying such amounts in cash, and (b) assume certain liabilities, including post-closing obligations under each assumed and assigned contract. The Debtors value the Stalking Horse Purchaser's bid at an aggregate amount of approximately$7,200,000.

17.    The Debtors negotiated with Banker Steel the terms of the Bid Procedures, which are designed to establish a fair, open, and competitive postpetition bidding process, subject to the time limitations driven by the Debtors' illiquidity, ongoing negative cash flow and other factors, to facilitate a result that is in the best interests of the Debtors' estates.

18.    The Sale of the Assets to the Buyer, or to such other purchaser who provides the highest and otherwise best bid for the Assets in accordance with the Bid Procedures, is the best method to obtain the optimal result under the circumstances. The DIP Facility is designed to provide liquidity sufficient to allow the Debtors to maintain their operations, and going-concern value, until the Sale of the Assets can be completed. Absent an expedited sale, the value of the Debtors as a going-concern will be immediately jeopardized because the Debtors will not have sufficient liquidity to continue operating for any material length of time.

### G.    THE BID PROCEDURES, THE AUCTION AND THE SALE HEARING

19.    The Debtors request that the Bid Procedures be established to govern the Sale process. The Debtors will entertain bids for the Assets to ensure that the Debtors achieve the best price for the Assets under all of the circumstances. As described below, if the Debtors receive at least one Qualified Bid (as defined below) prior to the bid deadline, then the Debtors intend to conduct the Auction to determine the highest and otherwise best offer for the Assets.

1. **The Bid Procedures**[5]

20.    The Debtors seek to establishMarch 11, 2016 as the deadline (the "Bid Deadline")
by which prospective bidders must submit a deposit and written binding bids to purchase the
Assets.  Only timely bids meeting all of the requirements of a Qualified Bid made by a Qualified
Bidder (as defined below), will be eligible for participation in the Auction.  This Bid Deadline is
not arbitrary; it is based, in part, on the fact that the Debtors' cash flow for the next several
months is  extremely tight and they project that they will fully exhaust the funds under the DIP
Facility by early May, 2016.  The Debtors project negative cash flow during these Chapter 11
Cases and no source from which to fund these short falls other than the proposed funding under
the DIP Facility.   Further, the Stalking Horse Purchaser is unwilling to provide the value
furnished by the APA if the sale process is not consummated within the proposed timeline.  If the
sale does not proceed in the time requested by the Debtors, the Debtors would likely not have
sufficient cash to continue operating after the DIP Facility expired.

21.    The Bid Procedures provide for potential bidders to conduct due diligence until
the Bid Deadline.   The potential bidders will be required to have executed a confidentiality
agreement and provide current financial statements or other evidence demonstrating the party's
financial capability to consummate the Sale before conducting the due diligence.  Due diligence
access may include such management meetings as may be scheduled by the Debtors, access to
due diligence materials, on-site inspections, and such other matters which a potential bidder may
reasonably request and as to which the Debtors, in their sole discretion, may agree consistent
with the Bid Procedures.  Each potential bidder shall be deemed to acknowledge and represent
that it has had an opportunity to inspect and examine the Debtors' business and to conduct any

---

[5] This summary is provided for convenience only and is qualified in its entirety by the Bid Procedures attached
hereto as **Exhibit "B"**.  To the extent that there is any discrepancy, the terms and conditions of the Bid Procedures
shall control.  Interested parties are urged to read the Bid Procedures in full.

and all due diligence prior to making its offer, that it has relied solely upon its own independent review, investigation and/or inspection of any documents in making its proposal and that it did not rely upon any written or oral statements, representations, promises, warranties or guaranties whatsoever, whether express, implied, by operation of law or otherwise, regarding the Debtors' business or the completeness of any information provided in connection with the bidding process.

22.    Banker Steel, the Prepetition Secured Lender, and the DIP Lender shall each be deemed a Qualified Bidder.  The Prepetition Secured Lender and the DIP Lender shall each be entitled to credit bid all or a portion of their respective claims against the Debtors.  For all other bidders, to be a Qualified Bidder, a party must submit a Qualified Bid (as defined in the Bid Procedures), and be deemed by the Debtors in the exercise of their reasonable business judgment to be financially able to consummate the proposed purchase of the Assets.

23.    The Debtors seek to establishMarch 18, 2016 as the Auction date.  If the Debtors do not receive a Qualified Bid, then the Debtors will not proceed with the Auction and will seek approval of a sale to the Stalking Horse Purchaser on the terms of the APA at the Sale Hearing. If the Debtors receive at least one Qualified Bid, then the Debtors propose to conduct a competitive Auction.  The Court shall hold the Sale Hearing to confirm the results of the Auction.

24.    The Debtors shall, in their sole discretion and after consultation with the committee, if any, (i) determine, in their business judgment, which Qualified Bid at the Auction is the highest and otherwise best offer (the "Successful Bid").  This determination shall take into account any factors the Debtors, in consultation with the committee, if any, reasonably deem relevant to the value of the Qualified Bid to the estates and may include, among other things, the

following: (a) the amount and nature of the consideration; (b) the number, type and nature of any changes to the Stalking Horse Purchase Agreement requested by each Bidder; (c) the extent to which such modifications are likely to delay closing of the sale of the Assets and the cost to the Debtors of such modifications or delay; (d) the amount and nature of the consideration to be received by the Debtors; (e) the likelihood of the Bidder's ability to close a transaction and the timing thereof; and (f) the net benefit to the estate, taking into account the Stalking Horse Purchaser's rights to the Break-Up Fee and Expense Reimbursement.

25.    Once the Qualified Bidder with the highest and best bid is identified (the "Successful Bidder"), the Debtors will submit the Successful Bid for approval by the Court. The Sale Hearing may be adjourned or continued at the Debtors' discretion and the Court's schedule, provided however that if the Stalking Horse Purchaser is the Successful Bidder then the Sale Hearing shall not be adjourned (unless extended with the express written consent of the Stalking Horse Purchaser or as adjourned by the Court).

26.    The Bid Procedures contain the following provisions, which are more fully described in the Bid Procedures outlined above:

**Qualified Bidders:** To become a Qualified Bidder a proposed bidder must identify the individuals qualified to act, provide financial information establishing its ability to perform, enter into a confidentiality agreement and: (i) provide a cash deposit of 10% of the cash purchase price of such bid; (ii) be on same or better terms than the terms of the Stalking Horse Purchase Agreement; (iii) each Bid must be based on the Stalking Horse Purchase Agreement and include (a) a purchase agreement signed by the Qualified Bidder and (b) a blackline reflecting the bidder's proposed changes to the Stalking Horse Purchase Agreement, (iv) propose a minimum purchase price comprised of each of the following (a) cash and/or noncash consideration in an amount that is at least equal to the aggregate consideration provided by the Stalking Horse Purchase Agreement; without limiting the foregoing, each bid must include cash consideration in an amount necessary to satisfy in full all outstanding obligations under the DIP Facility and the Prepetition Loan; **plus** (b) additional cash consideration in an amount equal to the sum of (x) the full dollar value of the break-up fee payable to the Stalking Horse Purchaser, (y) the full dollar value of the expense reimbursement payable to the Stalking Horse Purchaser, and (z) $100,000; (v) contain a comprehensive list of all executory contracts

and leases that they seek to have assumed and assigned to the bidder; (vi) provide for the payment or assumption of at least all of the Assumed Liabilities, provided however that the obligations owed under the DIP Facility and the Prepetition Loan may not be assumed unless otherwise agreed to by the DIP Lender or the Prepetition Lender, respectively, in each case in such party's sole and absolute discretion; (vii) include written evidence reasonably accepted to the Debtors demonstrating corporate authority to consummate the bid; and (viii) provide written evidence of a firm commitment for financing or other evidence of the financial wherewithal of such bidder that the Debtors reasonably believe provides the ability to consummate the Sale and satisfy the standards to provide adequate assurance of future performance under Bankruptcy Code Section 365, Each bid must be irrevocable and not contingent, and submitted before the bid deadline.

**Bid Protections to Banker Steel:** If Banker Steel is not the Successful Bidder or if the APA is terminated by the Debtors pursuant to Section 8.01, then Banker Steel shall be entitled to a break-up fee of four (4) percent of the estimated Cash Purchase Price (as defined in the APA)(the "Break-Up Fee") and an amount to exceed $250,000 for expense reimbursements to which Banker Steel is entitled under its Stalking Horse Purchase Agreement ("Expense Reimbursement" and, together with the Break-Up Fee, the "Bid Protections"), with the obligation of the Debtors to pay such Break-Up Fee and Expense Reimbursement deemed an allowed administrative expense claim under section 503(b) of the Bankruptcy Code, senior to all other administrative expenses claim, in the Chapter 11 Cases. The Break-Up Fee and Expense Reimbursement shall be payable in accordance with Section 8.05 of the APA.

**Modification of Bidding and Auction Procedures:** The Debtors shall determine, after consultation with the Committee, (a) which Qualified Bid, if any, is the highest, best, and/or otherwise financially superior offer; and (b) reject at any time before entry of orders of the Bankruptcy Court approving a Qualified Bid, any Bid that is (i) inadequate or insufficient, (ii) not in conformity with the requirements of the Bankruptcy Code, the Bid Procedures, or the terms and conditions of the Sale, or (iii) contrary to the best interests of the Debtors, their estates and creditors. The Debtors, in the exercise of their fiduciary obligations, and in consultation with the Committee, may announce at the Auction additional procedural rules that are reasonable under the circumstances for conducting the Auction so long as such rules are not inconsistent in any material respect with these Bid Procedures or the Stalking Horse Purchase Agreement.

**Closing with Backup Bidders:** The Debtors reserve the right to seek approval of the second best bid as a Back-Up bid and may seek approval at the Sale Hearing to close the Sale to that back-up bidder if the Successful Bidder fails to close for any reason.

**Provisions Governing the Auction:** Only the authorized representatives and respective counsel and advisors of each of the Qualified Bidders, the Debtors, the Debtors' equity holders, the DIP Lender and any statutorily appointed official committee of unsecured creditors shall be permitted to attend the Auction. The Debtors and their professionals shall direct and preside over the Auction. The Auction shall be held at 10:00 a.m. on March 18, 2016, at the offices of Tarter Krinsky & Drogin LLP, 1350 Broadway, 11th Floor, New York, New York 10018. During the Auction, bidding shall begin initially with the highest and best Qualified Bid, as determined by the Debtors in accordance

with the Bid Procedures, with the consultation of the Committee. All Bids made thereafter shall be Overbids (as defined in the Bid Procedures) and shall be made and received on an open basis, and all material terms of each Bid shall be fully disclosed to all other Qualified Bidders. Each Qualified Bidder participating in the Auction will be required to confirm that it has not engaged in any collusion regarding the Bid Procedures, the Auction or the proposed transaction. The initial minimum overbid will be by $50,000 and each bid thereafter shall require a minimum additional increment of $50,000. The Bid Protections will be taken into account in each round of bidding. For the avoidance of doubt, during the Auction, any bid by Banker Steel shall be deemed to be increased by the amount of the Break-Up Fee and Expense Reimbursement, provided that in the event that Banker Steel is the Successful Bidder and its Successful Bid includes the Break-Up Fee and Expense Reimbursement, Banker Steel shall be entitled to credit these amounts against the purchase price.

27.    Any and all disputes related or pertaining to or resulting or arising from the marketing process, the Auction, the Sale of the Assets, and/or the conduct of the Debtors, and/or any of the Debtors' professional advisors shall be adjudicated solely by the Bankruptcy Court. The submission of a bid shall constitute an express consent by the bidder to the exclusive jurisdiction of the Bankruptcy Court for all such matters. Nothing herein shall be deemed an admission or acknowledgement that any party has standing in respect of such disputes.

28.    The closing of the Sale of the Assets to such entity that submits the Successful Bid will occur in accordance with the terms of the executed asset purchase agreement (or if the Successful Bidder is the Stalking Horse Purchaser, the APA). If for any reason the party making the Successful Bid fails to consummate the Sale, then the offeror for the second highest and best Qualified Bid will be deemed to have submitted the highest and best Successful Bid, and the Successful Bid shall be the bid which immediately preceded the original, but unconsummated, Successful Bid. Deposits by Qualified Bidders will be returned or forfeited, as the case may be, as set forth in the Bid Procedures.

29.    The Bid Procedures are designed to maximize value for the Debtors' estates and will enable the Debtors and their professionals to review, analyze and compare all bids received to determine which bids are in the best interests of the Debtors' estates. The Debtors submit that

the Bid Procedures afford the Debtors a sufficient opportunity to pursue a sale process that will

maximize the value of their estates.

2.    **The Stalking Horse Purchase Agreement**

30.    The following summary highlights the material terms of the Stalking Horse

Purchase Agreement and the Sale Order and all parties in interest are referred to the text of the

attached Stalking Horse Purchase Agreement and Sale Order for additional information.[6]

> **Proposed Purchaser.** Banker Steel NY, LLC and Banker Steel NJ, LLC.  The Stalking Horse Purchasers are not, and have never been, insiders of, and are in no way related to the Debtors or any of their affiliates, including their non-debtor affiliates.

> **Sellers.** All of the Debtors.

> **Final Purchase Price.** $2,000,000 cash plus an amount in cash necessary to pay the Prepetition Loan and the DIP Facility balance due (estimated to be approximately $5 million plus accrued interest as of the Closing Date), and assuming all of the Assumed Liabilities (estimated at approximately $200,000).

> **Agreements with Management.** The Stalking Horse Purchase Agreement contemplates that the Stalking Horse Purchasers will, as of the Closing Date, enter into a consulting agreement with Barry King (the Debtors' principal) and B. King Construction Management Inc., an entity owned by Mr. King.).

> **Closing and Other Deadlines.** As set forth in Section 2.06 of the Stalking Horse Purchase Agreement, the Debtors are required to (i) deliver various conveyance documents to transfer the Assets and to assign the Assigned Contracts.  The Closing is scheduled to close no later than seventy-five days after the Petition Date.

> **Good Faith Deposit.** Banker Steel shall not be required to provide a good faith deposit.

> **Tax Exemption.** Any sales, use, property transfer or gains, documentary, stamp, registration, recording or similar Tax (including, for certainty, goods and services tax, harmonized sales tax and land transfer tax) payable solely as a result of the Sale or transfer of the Assets pursuant to this Agreement ("Transfer Taxes") shall (to the extent not subject to an exemption under the Bankruptcy Code) be borne by Banker Steel.  The Debtors and Banker Steel shall use reasonable efforts and cooperate in good faith to exempt the Sale and transfer of the Assets from any such Transfer Taxes.  Banker Steel

---

[6] Capitalized terms used in this summary but not otherwise defined herein shall have the meanings ascribed to them in the Stalking Horse Purchase Agreement.  To the extent that there are any inconsistencies between the description of the Stalking Horse Purchase Agreement or the Sale Order contained herein and the Stalking Horse Purchase Agreement or the Sale Order, as applicable, the terms of the Stalking Horse Purchase Agreement or the Sale Order, as applicable, control.

shall prepare and file all necessary Tax Returns or other documents with respect to all such Transfer Taxes.

**Record Retention.** The Debtors' records will be turned over to Banker Steel, but the Debtors will have the right to retain copies and to obtain copies on reasonable request.

**Sale of Avoidance Actions.** Banker Steel shall not purchase, acquire, or accept from Sellers avoidance actions.

**Findings as to Successor Liability.** Banker Steel is conditioning its willingness to acquire the Assets on a finding that it is not a mere continuation of the Debtors or their estates and there is no continuity of enterprise between Banker Steel and the Debtors. Banker Steel is not holding itself out to the public as a continuation of the Debtors. Banker Steel is not a successor to the Debtors or their estates and the Sale does not amount to a consolidation, merger or de facto merger of Banker Steel and the Debtors. Banker Steel is buying the Assets as a going concern.  Further, Banker Steel seeks a provision of the Sale Order that shall vest it with title to the Assets and, upon the Debtors' receipt of the Purchase Price, other than with respect to Assumed Liabilities or as otherwise set forth in the Stalking Horse Purchase Agreement, that title shall be free and clear of all Liens, Claims, Encumbrances and other interests of any kind or nature whatsoever, including but not limited to, successor or successor-in-interest liability.

**Requested Findings as to Fraudulent Conveyances or Transfers.** The proposed Sale Orders for the Stalking Horse Purchaser contains finding of fact and conclusions of law with respect to the consideration paid and the elements of a fraudulent transfer.

**Sale Free and Clear.** Upon the terms and subject to the conditions set forth in the Stalking Horse Purchase Agreement, the Debtors shall sell, assign, convey, transfer and deliver to the Stalking Horse Purchasers, and the Stalking Horse Purchasers shall purchase from the Debtors, all of the Debtors' right, title and interest in the Assets, free and clear of all liens, claims, encumbrances and interests other than the Assumed Liabilities.

**Credit Bid.** The Prepetition Secured Lender and the DIP Lender (or any affiliated assignee thereof) will be allowed to credit bid the amount of any debt incurred pursuant to the Prepetition Loan and the DIP Facility.

**Other Agreements**.  The Stalking Horse Purchase Agreement contemplates that the Stalking Horse Purchasers will, as of the Closing Date, enter into a consulting agreement with Larry Davis, one of the Debtors' creditors.

**Relief from Bankruptcy Rules 6004(h) and 6006(d).** The Debtors are seeking a waiver of the fourteen (14) day stay under Bankruptcy Rules 6004(h) and 6006(d) for the reasons discussed below.

31.     The Debtors believe that the foregoing transaction is in the best interests of the

Debtors (and is the best available transaction under the current circumstances). The Debtors

submit that all negotiations with Banker Steel were at arms' length, were fair and reasonable, and the fruit of such negotiations will inure to the benefit of the Debtors' bankruptcy estates. The Debtors respectfully request that this Court approve the relief requested herein.

3.    **Assumption and Assignment Noticing Procedures**

32.    To facilitate and consummate the Sale of the Assets, the Debtors seek authority to assume and assign certain executory contracts and unexpired leases following the Auction, if any, pursuant to Section 365(f) of the Bankruptcy Code under the APA (collectively, the "Assigned Contracts") as set forth in Schedule A to the APA. Any Qualified Bidder must identify all executory contracts and unexpired leases that it wishes to have assumed and assigned in the event it is deemed the highest bidder:

a.    **Notices for Assigned Contracts.** On or before three (3) business days after the entry of the Bid Procedures Order, the Debtors shall serve by first class mail or hand delivery on all non-Debtor counterparties to any Contract or Lease (the "Contract Notice Parties") a "Notice of Assumption and Assignment" in the form attached to the Bid Procedures Order as Exhibit C that identifies, to the extent applicable (a) the Contract or Lease that may be an Assigned Contract, (b) the name of the counterparty to such Contract or Lease, (c) any applicable cure amount for such Contract or Lease if it becomes an Assigned Contract, and (d) the deadline (the "Objection Deadline") by which any such Contract or Lease counterparty must file an objection (a "Contract Objection") to the proposed assumption and assignment; *provided, however*, that the presence of a Contract or Lease on a Contract Notice does not constitute an admission that such Contract or Lease is an executory contract and does not bar any Qualified Bidder from removing any such Contract or Lease from its list of Contracts and Leases to be assumed and assigned. In addition, if the Debtors identify additional Contracts or Leases that might be assumed by the Debtors and assigned to the Successful Bidder not set forth in the original Notice of Assumption and Assignment, the Debtors shall promptly send a supplemental notice (a "Supplemental Notice of Assumption and Assignment") to the applicable counterparties to such additional Contracts and Leases. Within one (1) business day after the conclusion of the Auction, the Debtors shall file with the Court and serve a notice identifying the Successful Bidder and Backup Bidder to the non-debtor parties to the Contracts and Leases that have been identified in such Successful Bid and Backup Bid.

b.    **Objections to Assumption of Contracts.** For all non-Debtor counterparties to an Assigned Contract served a Notice of Assumption and Assignment in accordance with this Order, to which no Contract Objection was filed by the later of (i) 5:00 p.m. (prevailing Eastern Time) on the date that is seven (7) days prior to the Sale Hearing, or

(ii) 5:00 p.m. (prevailing Eastern Time) on the date that is fourteen (14) days after service of the relevant Supplemental Notice of Assumption and Assignment. A Contract Objection must set forth the specific default alleged under the applicable Contract or Lease and claim a specific monetary amount that differs from the applicable cure amount, if any, and/or further information required of the Stalking Horse Purchaser with respect to adequate assurance of future performance. Notwithstanding the foregoing, each non-debtor party to a Contract or Lease shall retain the right to object, at the Sale Hearing, to the assumption and assignment of its Contract or Lease based solely on the issue of whether the Successful Bidder or Backup Bidder can provide adequate assurance of future performance as required by section 365 of the Bankruptcy Code in the event the Stalking Horse Purchaser is not the Successful Bidder. If no Contract Objection is filed by a counterparty, then such counterparty to such Assigned Contract shall be deemed to have waived and released any right to assert an objection to the assumption and assignment of such Assigned Contract and to have otherwise consented to such assumption and assignment and cure amount, and the assignment will be deemed effective in accordance with the Sale Order. If any counterparty timely files a Contract Objection that cannot be resolved by the Debtors and the counterparty, the Court shall resolve such Contract Objection prior to assumption and assignment of such designated Contract or Lease, and upon entry of an order by the Court resolving such Contract Objection, the assignment shall be deemed effective in accordance with the Sale Order.

33.     Any party failing to timely file a Contract Objection shall be forever barred and estopped from objecting thereto, including asserting against the Debtors or any of the Debtors' estates, Banker Steel or other Successful Bidder that any additional cure or default amounts are due or conditions to assumption and assignment must be satisfied under such executory contract(s) or unexpired lease(s) and shall be deemed to consent to the assumption and assignment of such executory contract(s) or unexpired lease(s) effectuated in connection therewith.

34.     A properly filed and served Contract Objection will reserve such objecting party's rights against the Debtors with respect to the relevant cure objection, but will not constitute an objection to the remaining relief requested in the Sale Motion.

## **RELIEF REQUESTED**

35.     By the Sale Motion, the Debtors seek: (a) entry of the Bid Procedures Order (i) approving bidding procedures in connection with the Sale of substantially all of the assets of the

Debtors, (ii) authorizing the Debtors to enter into the Stalking Horse Purchase Agreement and approving certain stalking horse bid protections, (iii) approving the form and manner of notice of the Sale Hearing, and (iv) approving certain procedures related to the assumption and assignment of executory contracts and unexpired leases; and (b) following the Sale Hearing, entry of a Sale Order: (i) authorizing the Debtors to sell the Assets to the Successful Bidder; (ii) authorizing the assumption and assignment of the Assigned Contracts to be set forth in the Stalking Horse Purchase Agreement, and determining the amount of any cure payment required to be paid in connection therewith; (iii) finding that the Successful Bidder: (x) is a good faith purchaser of the Assets; (y) is qualified to acquire the Assets; and (z) therefore will acquire the Assets in good faith within the meaning of section 363(m) of the Bankruptcy Code; and (iv) waiving the fourteen (14) day stay requirements of Bankruptcy Rules 6004(h) and 6006(d).

## BASIS FOR THE RELIEF REQUESTED

### A.    Conducting a Public Auction Pursuant to the Sale Procedures is in the Best Interests of the Estates and the Creditors

36.    Section 363(b) of the Bankruptcy Code provides that a debtor in possession, "after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b).  A proposed use or sale of property pursuant to section 363(b) is appropriate if "some articulated business judgment" exists for the transaction. See, e.g., Walter v. Sunwest Bank (In re Walter), 83 B.R. 14, 19-20 (B.A.P. 9th Cir. 1988) (quoting Institutional Creditors of Cont'l Air Lines, Inc. v. Cont'l Air Lines, Inc. (In re Cont'l Air Lines, Inc.), 780 F.2d 1223, 1226 (6th Cir. 1986)); Fulton State Bank v. Schipper (In re Fulton State Bank), 933 F.2d 513, 515 (7th Cir. 1991).  The Debtors seek approval of the Bid Procedures as a means to maximize the value of the recovery for its creditors through the Sale of the Assets.

37.    Bankruptcy courts applying section 363 frequently have considered and approved bidding procedures in advance of a proposed sale of property of the estate.  See, e.g., Doehring v. Crown Corp. (In re Crown Corp.), 679 F.2d 774, 775 (9th Cir. 1982) (noting that the district court had required specified minimum overbid amounts, deposits, and the form of purchase agreement to be used by bidders); In re Crowthers McCall Pattern, Inc., 114 B.R. 877, 878-879 (Bankr. S.D.N.Y. 1990) (noting that the bankruptcy court had entered an order requiring that overbids be made in specified minimum increments with deposits); In re Adelphia Communications Corp., 336 B.R. 610, 629-30 (Bankr. S.D.N.Y. 2006) ("It is the common practice for bankruptcy courts, in connection with the sales of businesses or lines of business, to enter orders approving bidding procedures and bidding-related obligations . . . before being asked to approve the resulting sale itself.").

38.    A debtor's business judgment is entitled to great deference with respect to the procedures to be used in selling assets from the estate.  See, e.g., Official Comm. of Subordinated Bondholders v. Integrated Res., Inc. (In re Integrated Res., Inc.), 147 B.R. 650, 656-57 (S.D.N.Y. 1992) (noting that overbid procedures and break-up fee arrangements that have been negotiated by a debtor in possession are to be reviewed according to the deferential "business judgment" standard, under which such procedures and arrangements are "presumptively valid"), appeal dismissed, 3 F.3d 49 (2d Cir. 1993).

39.    In analyzing the propriety of bidding procedures, a court will examine whether such procedures allow third parties to submit higher and better bids and whether potential bidders have sufficient time to conduct their own due diligence.  In re Edwards, 228 B.R. 552, 561 (Bankr. E.D. Pa. 1998) (requiring bid procedures that allow for "an open and fair public sale designed to maximize value for the estate."); In re Fin. News Networks, Inc., 126 B.R. 152, 156

(Bankr. S.D.N.Y. 1991), appeal dismissed, 931 F.2d 217 (2d Cir. 1991).   Moreover, the hallmarks of good faith in any sale procedure are the receipt of adequate value through higher and better offers and full and accurate disclosure of the terms of the proposed sale to third parties invited to bid.

### 1.    The Proposed Bid Procedures Will Maximize the Value of the Assets by Allowing Competing Bidders to Participate in an Auction

40.    The paramount goal in any proposed sale of property of the estate is to maximize the proceeds received by the estate.  See, e.g., Four B. Corp. v. Food Barn Stores, Inc. (In re Food Barn Stores, Inc.), 107 F.3d 558, 564-65 (8th Cir. 1997) (stating that, in bankruptcy sales, "a primary objective of the Code [is] to enhance the value of the estate at hand"); In re Integrated Res. Inc., 147 B.R. at 659 ("It is a well-established principle of bankruptcy law that the objective of bankruptcy rules and the Debtors' duty with respect to such sales is to obtain the highest price or greatest overall benefit possible for the estate.") (quoting In re Atlanta Packaging Prods., Inc., 99 B.R. 124, 130 (Bankr. N.D. Ga. 1998)).

41.    To that end, courts uniformly recognize that procedures intended to enhance competitive bidding are consistent with the goal of maximizing the value received by the estate and are appropriate in the context of bankruptcy sales.  See, e.g., In re Integrated Res., Inc., 147 B.R. at 659 (stating such procedures should "encourage bidding and [ ] maximize the value of the Debtors' assets"); In re Financial News Network, Inc., 126 B.R. at 156 (S.D.N.Y. 1991) (stating that "court-imposed rules for the disposition of assets ... [should] provide an adequate basis for comparison of offers, and [ ] provide for a fair and efficient resolution of bankrupt estates").

42.    Here, the proposed Bid Procedures will allow and encourage interested parties to submit competing bids at the Auction, thereby maximizing the value that the Debtors will

receive for the Assets, yet at the same time ensure that any Qualified Bid provides more than what Banker Steel has offered. By inviting others to participate in the Auction, the Debtors will be able to determine the highest and best price possible for the Assets. The Bid Procedures will increase the likelihood that the Debtors will receive the greatest consideration possible for the Assets and will facilitate a competitive and fair bidding process, subject to the limitations imposed by the Debtors' severe liquidity constraints.

43.    Absent a prompt Sale, the value of the Debtors' assets will decline because of the Debtors' ongoing cash flow difficulties. The Prepetition Secured Lender has provided the Debtors with the Prepetition Loan and has agreed to fund the DIP Facility. Without the DIP Facility, the Debtors will not be able to fund their ongoing expenses and would not enable them to preserve their going concern value, because the Debtors' projections show that their ongoing operating expenses will exceed the collections of cash for the foreseeable future and, therefore, the Debtors will run out of cash and have to cease operating, absent the DIP Facility or an immediate Sale.

44.    The proposed Bid Procedures will allow the Debtors to conduct the Auction in a controlled, fair and open fashion that will encourage participation by financially capable bidders who demonstrate the ability to close a transaction. The Bid Procedures and the stalking horse bid from Banker Steel (1) will encourage, rather than hinder, bidding for the Assets, (2) are consistent with other procedures previously approved by courts in this district, and (3) are appropriate under the relevant standards governing auction proceedings and bidding incentives in bankruptcy proceedings. Accord In re Randall's Island Family Golf Ctrs., Inc., 261 B.R. 96 (Bankr. S.D.N.Y. 2001) aff'd, 272 B.R. 521, (S.D.N.Y. 2002); In re Integrated Res., Inc., 147 B.R. at 650-56; In re 995 Fifth Ave. Assocs., L.P., 96 B.R. 24 (Bankr. S.D.N.Y. 1989).

### 2.    Potential Bidders Will Have Time to Conduct Due Diligence

45.    The Debtors, with the assistance of Getzler Henrich, will continue to look for strategic buyers, financial buyers and will continue to do so.  The Debtors will send notice of the Sale Motion and Bidding Procedures to all parties that the Debtors believe may be potentially interested in acquiring the Assets promptly after the Court's consideration of the proposed Bid Procedures.  The Bid Procedures will allow any prospective bidders and other interested parties time before the Bid Deadline to conduct any due diligence required.  If other interested parties are discovered, the Debtors and Getzler Henrich will provide every possible opportunity to such parties to conduct the due diligence such parties need to submit the best possible Qualified Bid.  Therefore, potential bidders will have time to conduct due diligence with respect to the Assets.  While a longer period for conducting due diligence would be preferable in an ideal world, the reality is the Debtors' current cash collections are insufficient to enable the Debtors to continue operating as a going concern without the DIP Facility from Banker Steel. Banker Steel is prepared to provide certain additional cash and to maintain the Debtors' ability to continue operating, but only for a limited period of time to provide for reasonable notice and court approval procedures.  The proposed DIP Facility, which is the subject of the DIP Financing Motion filed contemporaneously herewith, expires on or around June 14, 2016, absent approval of a Sale prior to that date.  More importantly, this due date is not arbitrary.  It is driven by the fact that the maximum credit available thereunder will be exhausted by early May, 2016 and that the Stalking Horse Purchaser is unwilling to provide the value furnished by the APA if the sale process is not consummated within the proposed timeline.

### 3.    The Debtors Will Provide Full and Accurate Disclosure of the Terms of the Sale to Potential Bidders

46.    The terms of the Sale of the Assets will be contained in the Stalking Horse

Purchase Agreement, the form of which will be provided to each potential bidder. Potential

bidders will also receive a copy of the Bid Procedures Order and the Bid Procedures. Therefore,

the Debtors will have provided full and accurate disclosure of the terms of the prospective Sale

of the Assets to all potential bidders.

47.     For all of these reasons, the Court should approve the Bid Procedures as a sound

exercise of the Debtors' business judgment.

### 4.     The Break-Up Fee and Expense Reimbursement Is Appropriate

48.     In order to compensate the Stalking Horse Purchaser for its time, effort, expense,

and risk that it incurred in negotiating, documenting, and seeking to consummate the Sale, the

Bid Procedures also provide that if the Stalking Horse Purchaser is not the Successful Bidder,

and if an alternative transaction closes, the Stalking Horse Purchaser will be entitled to the Bid

Protections, which such Bid Protections shall constitute administrative expenses in the Debtors'

bankruptcy cases.

49.     Bid protections are a normal and, in many cases, necessary components of sales

conducted under the Bankruptcy Code:

> Break-up fees are important tools to encourage bidding and to maximize
> the value of the debtor's assets .... In fact, because the... corporation ha(s)
> a duty to encourage bidding, break-up fees can be *necessary* to discharge
> [such] duties to maximize values.

*Integrated Resources,* 147 B.R. at 659-60 (emphasis in original). Specifically, "breakup fees and

other strategies may be legitimately necessary to convince a 'white knight' bidder to enter the

bidding by providing some form of compensation for the risks it is undertaking." *995 Fifth Ave.,*

96 B.R. at 28 (quotations omitted). *See also Integrated Resources,* 147 B.R. at 660-61 (break-up

fees can prompt bidders to commence negotiations and "ensure that a bidder does not retract its

bid"); *In re Hupp Indus., Inc.,* 140 B.R. 191, 194 (Bankr. N.D. Ohio 1992) ("without such fees,

bidders would be reluctant to make an initial bid for fear that their first bid will be shopped around for a higher bid from another bidder who would capitalize on the initial bidder's . . . due diligence").

50.    As a consequence, courts frequently approve bid protections in connection with proposed bankruptcy sales.    Courts considering the propriety of proposed bid protections typically consider "(1) whether the relationship of the parties who negotiated the fee is marked by self-dealing or manipulation; (2) whether the fee hampers, rather than encourages, bidding; and (3) whether the amount of the fee is reasonable in relation to the proposed purchase price." *In re Twenver, Inc.,* 149 B.R. 954, 956 (Bankr. D. Colo. 1992); *accord, In re Bidermann Indus. U.S.A., Inc.,* 203 B.R. 547, 552 (Bankr. S.D.N.Y. 1997); *Integrated Resources,* 147 B.R. at 657.

51.    The Bid Protections are fair and reasonable in amount, particularly in view of the efforts that have been and will be expended by the Stalking Horse Purchaser.  Moreover, without the proposed Bid Protections, the Debtors risk losing the Stalking Horse Purchaser's offer to the detriment of the estates.  Moreover, the Debtors believe that the willingness of the Stalking Horse Purchasers to commit to a sale of the Assets, subject to higher or otherwise better offers, may encourage third parties to submit bids for the Assets and will encourage customers, employees and vendors to support operations during this case.  The Debtors believe that the Bid Protections will not deter or chill bidding.

52.    In sum, the Debtors' ability to offer the Bid Protections enables them to ensure the sale of the Debtors' assets at a price that they believe to be fair while, at the same time, providing them with the potential of even greater benefit to the estates.  Thus, the Bid Protections should be approved.  Accordingly, the proposed Bid Protections are reasonable and appropriate under the circumstances.

**B.**    **The Debtors Have Articulated a Reasonable Business Justification for the Sale of the Assets**

53.    Ample justification exists for approval of the proposed Sale of the Assets. Section 363 of the Bankruptcy Code provides that a debtor, "after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b)(1). Section 105(a) of the Bankruptcy Code provides in pertinent part that "[t]he court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of [the Bankruptcy Code]." 11 U.S.C. § 105(a).

54.    A sale of a debtor's assets outside of the ordinary course of business should be approved if supported by a sound business purpose. See, e.g., Comm. of Equity Sec. Holders v. Lionel Corp. (In re Lionel), 722 F.2d 1063, 1070-71 (2d Cir. 1983); In re Global Crossing Ltd., 295 B.R. 726 (Bankr. S.D.N.Y. 2003); see also Meyers v. Martin (In re Martin), 91 F.3d 389, 395 (3d Cir. 1996); Dai-Ichi Kangyo Bank Ltd. v. Montgomery Ward Holding Corp. (In re Montgomery Ward Holding Corp.), 242 B.R. 147, 153 (D. Del. 1999); In re Del. & Hudson Ry. Co., 124 B.R. 169, 176 (D. Del. 1991); In re Trans World Airlines, Inc., No. 01-00056 (PJW), 2001 WL 1820326, at *10 (Bankr. D. Del. Apr. 2, 2001).

55.    Courts typically consider the following factors in determining whether to approve a sale under section 363: (i) whether a sound business justification exists for the sale; (ii) whether adequate and reasonable notice of the sale was given to interested parties; (iii) whether the sale will produce a fair and reasonable price for the property; and (iv) whether the parties have acted in good faith. See In re Del. & Hudson Ry., 124 B.R. at 176; In re Phoenix Steel Corp., 82 B.R. 334, 335-36 (Bankr. D. Del. 1987); In re United Healthcare Sys., Inc., No. 97¬1159, 1997 WL 176574, at *4 and n.2 (D.N.J. Mar. 26, 1997).

56.    A sound business purpose for the sale of a debtor's assets outside the ordinary

course of business may be found where such a sale is necessary to preserve the value of assets

for the estate, its creditors, or interest holders.  See, e.g., In re Abbotts Dairies of Pa. Inc., 788

F.2d 143 (3d Cir. 1986); In re Lionel Corp., 722 F.2d 1063 (2d Cir. 1983).  In fact, the

paramount goal in any proposed sale of property of the estate is to maximize the proceeds

received by the estate.  See Four B Corp. v. Food Barn Stores, Inc. (In re Food Barn Stores, Inc.),

107 F.3d 558, 564-65 (8th Cir. 1997) (In bankruptcy sales, "a primary objective of the Code [is]

to enhance the value of the estate at hand"); Official Comm. of Subordinated Bondholders v.

Integrated Res., Inc. (In re Integrated Res., Inc.), 147 B.R. 650, 659 (Bankr. S.D.N.Y. 1992) ("It

is a well-established principle of bankruptcy law that the . . . [Debtor's] duty with respect to such

sales is to obtain the highest price or greatest overall benefit possible for the estate." (quoting

Cello Bag Co. v. Champion Int'l Corp.In re Atlanta Packaging Prods., Inc.), 99 B.R. 124, 130

(Bankr. N.D. Ga. 1988))), appeal dismissed, 3 F.3d 49 (2d Cir. 1993).

57.    Furthermore, once "the debtor articulates a reasonable basis for its business

decisions (as distinct from a decision made arbitrarily or capriciously), courts will generally not

entertain objections to the debtor's conduct." Comm. of Asbestos Related Litigants and/or

Creditors v. Johns Manville Corp. (In re Johns Manville Corp.), 60 B.R. 612, 616 (Bankr.

S.D.N.Y. 1986). There is a presumption that "in making a business decision the directors of a

corporation acted on an informed basis, in good faith and in the honest belief that the action

taken was in the best interests of the company." In re Integrated Res., 147 B.R. at 656 (quoting

Smith v. Van Gorkom, 488 A.2d 858, 872 (Del. 1985)).  Thus, if a debtor's actions satisfy the

business judgment rule, then the transaction in question should be approved under section

363(b)(1).    Indeed, when applying the "business judgment" standard, courts show great

deference to a debtor's business decisions. See Pitt v. First Wellington Canyon Assocs. (In re

First Wellington Canyon Assocs.), No. 89 C 593, 1989 WL 106838, at *3 (N.D. 111. Sept. 8, 1989) ("Under this test, the debtor's business judgment ... must be accorded deference unless shown that the bankrupt's decision was taken in bad faith or in gross abuse of the bankrupt's retained discretion.").

### 1.    **Sound Business Justification Exists**

58.    The Debtors have proposed the sale of the Assets after thorough consideration of all viable alternatives and has concluded that the Sale is supported by many sound business reasons. The Debtors identified Banker Steel as having the experience and expertise in the steel fabrication and erector industry and the wherewithal to complete the Debtors' pending projects thereby minimizing damage claims by the Debtors' customers. The Debtors negotiated the APA with Banker Steel as set forth above and the proposed Bid Procedures have been designed to maximize the purchase price realized from the Sale of the Assets. Furthermore, the postpetition marketing of the Assets up to the proposed deadline for competing bids will provide a sufficient opportunity to generate any potential overbids and maximize recovery of the Debtors' creditors.

59.    A sale of significant assets of a debtor during the early stages of a case is justified if (1) there would be substantial decrease in the value if the assets are not sold immediately, (2) existing customers and vendors would be reluctant to continue to do business with a company in a tenuous financial condition, and (3) the company would be unsustainable as a going concern due to lack of operating capital. See In re Med. Software Solutions, 286 B.R. 431, 331 (Bankr. D. Utah 2002). All three factors are present in these cases. The Debtors' projections show that the cash that their operations will generate for the next four months is less than the cash needed to pay the Debtors' ongoing expenses. The Debtors will be able to sustain their ongoing operations as a going concern only through the financing being provided by the DIP Lender under the DIP Facility. That financing will be exhausted by early May, 2016. Continued

operations of the Debtors as a going concern is critical to maximizing value for creditors. The Debtors believe that the only chance of retaining their employees, notwithstanding the potential concerns that may be created by the Debtors' recent financial challenges and the chapter 11 filings, is based on providing them with reasonable certainty that a transaction will be implemented in the near term future. The proposed expedited Bid Procedures are designed to provide that certainty. The Debtors' employees will know that a transaction is moving forward to fully fund ongoing operations and provide them with job security going forward. Therefore, the Debtors have demonstrated that a sound business justification exists to sell the Assets pursuant to the Stalking Horse Purchase Agreement.

> **2.    The Notice of the Sale of the Assets Will Be Accurate and Reasonable Under the Circumstances**

60.    As set forth above, the Debtors will provide accurate and reasonable notice of the Sale of the Assets under all of the facts and circumstances of these cases.

> **3.    The Price For the Assets Will Be Fair and Reasonable**

61.    The adequacy of purchase price is generally the function of whether the price was reached in good faith. In re Apex Oil Co., 92 B.R. 847, 874 (Bankr. E.D. Mo. 1988) (holding that the consideration was adequate where it was negotiated in good faith); In re Embrace Sys. Corp., 178 B.R. 112, 123 (Bankr. W.D. Mich. 1995) (denying motion to sell where there was no evidence that the asset was diligently or sufficiently marketed). Here, the purchase price for the Assets will be set at the Auction with competitive bidding. Thus, the Debtors believe that the purchase price for the Assets will be the best price and will be fair and reasonable.

62.    The Debtors believe that they will be able to obtain the best offer available in the time allowed by their existing lack of liquidity through the Auction, in accordance with the Bid Procedures, and that the purchase price it will obtain for the Assets will be the highest and best

offer the Debtors could obtain for such assets. See In re Integrated Res., Inc., 135 B.R. 746, 750 (Bankr. S.D.N.Y. 1992), aff d, 147 B.R. 650 (S.D.N.Y. 1992) (stating that the purchase price is fair and reasonable if it is the highest and best offer). The Debtors' compliance with the Bid Procedures Order and the Bid Procedures will provide the basis to find that any sale of the Assets does not constitute a fraudulent transfer because the purchase price represents reasonably equivalent value and is fair and reasonable. It will also establish that the Debtors and the Stalking Horse Purchaser, or any other Successful Bidder, have proceeded in good faith.

### 4. The Proposed Sale of the Assets Will Be Pursuant to the Stalking Horse Purchase Agreement, which is the Product of Good Faith

63.     Although section 363(b) of the Bankruptcy Code does not explicitly require good faith, courts have also required that a sale be made in good faith. In re Ewell, 958 F.2d 276, 281 (9th Cir. 1992). The Sale of the Assets to the Successful Bidder is proposed in good faith. Whether a proposed sale is in "good faith" focuses principally on the element of special treatment of the debtor's insiders in the sale transaction. Id.; In re Industrial Valley Refrigeration & Air Conditioning Supplies, Inc., 77 B.R. 15, 21 (Bankr. E.D. Pa. 1987).

64.     The Sale of the Assets will be on the basis of Qualified Bids received by the Debtors by the Bid Deadline, and if more than one Qualified Bid is received, then the best bid will be determined pursuant to the Auction. The bid of Banker Steel will be tested through a competitive marketing and bidding process. Furthermore, any bids submitted by potential buyers will be required to identify each entity that will be participating in such bid, and provide sufficient financial and other information regarding both the prospective bidder and all other parties participating in the bid to satisfy the Debtors with respect to the requirements enumerated in section 363(m) of the Bankruptcy Code. Accordingly, regardless of who ultimately acquires the Assets, the Sale will be the product of good faith.

C.    **The Bankruptcy Court Should Approve the Assumption by the Debtors of the Assigned Contracts**

65.    As stated above, to facilitate and effect the Sale of their Assets, the Debtors also seek authority to assume and assign certain Assigned Contracts to the Successful Bidder.

66.    Section 365(a) and (b) of the Bankruptcy Code authorizes debtors to assume executory contracts or unexpired leases subject to the Court's approval, and requires debtors to satisfy certain requirements at the time of assumption.    Under section 365(a) of the Bankruptcy Code, a debtor, "subject to the court's approval, may assume or reject any executory contract or unexpired lease of the debtor." 11 U.S.C. § 365(a).    Section 365(b)(1) of the Bankruptcy Code, in turn, codifies the requirements for assuming an unexpired lease or executory contract of a debtor, providing in relevant part that:

> (b)(1) If there has been a default in an executory contract or unexpired lease of the debtor, the trustee may not assume such contract or lease unless, at the time of assumption of such contract or lease, the trustee—
> (A)    cures, or provides adequate assurance that the trustee will promptly cure, such default ... ;
> (B)    compensates, or provides adequate assurance that the trustee will promptly compensate, a party other than the debtor to such contract or lease, for any actual pecuniary loss to such party resulting from such default; and
> (C)    provides adequate assurance of future performance under such contract or lease.

11 U.S.C. § 365(b)(1).

67.    The standard that is applied by the Second Circuit in determining whether an executory contract or unexpired lease should be assumed is the debtor's "business judgment" that the assumption is in its economic best interests.    See, e.g., In re Child World, Inc., 142 B.R. 87, 89 (Bankr. S.D.N.Y. 1992).    It is well established that a court should approve a debtor's motion to assume or reject an executory contract or unexpired lease where doing so will provide a benefit to the debtor's estate.    See, e.g., In re Balco Equities, Inc., 323 B.R. 85, 99 (Bankr. S.D.N.Y. 2005) ("In determining whether the debtor has employed reasonable business

discretion, the court for the most party must only determine that the rejection will likely benefit the estate.") (citation omitted).

68.     In the present case, the Debtors' assumption and assignment of certain Assigned Contracts to the Successful Bidder meets the business judgment standard and satisfies the requirements of section 365 of the Bankruptcy Code.   The assumption and assignment of Assigned Contracts are necessary for any Successful Bidder to conduct business going forward, and since no purchaser would take the Assets without certain Assigned Contracts, the assumption and assignment of such Assigned Contracts is essential to inducing the highest and best offer for the Assets.  Further, upon consummation of the proposed Sale of the Assets, the Debtors will no longer continue to operate their businesses and will therefore have no use for any of the Assigned Contracts utilized in their businesses.   Lastly, the proposed Assumption and Assignment Procedures ensure that all counterparties to Assigned Contracts to be assumed and assigned by the Debtors will have ample notice of such relief and an opportunity to contest any asserted Cure Amount, as well as the ability of the Successful Bidder to provide adequate assurance of future performance.

69.     Consequently, the Debtors submit that the Assumption and Assignment Procedures are fair and reasonable and respectfully request that the Court approve the Assumption and Assignment Procedures and authorize the Debtors to assume and assign any Assigned Contracts to the Successful Bidder.

**D.      The Debtors Have Satisfied the Other Provisions of Section 365 of the Bankruptcy Code Regarding Assumption of the Assigned Contracts**

70.     In addition to the business judgment test, section 365(b)(1) of the Bankruptcy Code provides that:

> If there has been a default in an executory contract or unexpired lease of the debtor, the trustee may not assume such contract or lease unless, at the time of assumption of such

contract or lease, the trustee

(A)    cures, or provides adequate assurance that the trustee will promptly cure, such default ... ;

(B)    compensates, or provides adequate assurance that the trustee will promptly compensate, a party other than the debtor to such contract or lease, for any actual pecuniary loss resulting from such default; and

(C)    provides adequate assurance of future performance under such contract or lease.

71.    The notice of the Sale will advise the other parties to the Assigned Contracts that to the extent that any party believes that there is an existing default under an Assigned Contract which requires a cure payment, such party must object to the assumption and assignment of such Assigned Contracts and will have an opportunity to raise its objection at the Sale Hearing.  The Debtors will resolve any such objections before the assumption of the corresponding Assigned Contract becomes effective.  If an objection cannot be resolved, the Debtors reserve the right not to assume and assign that contract.

72.    Further, as discussed in detail below, the Debtors will require any prospective bidder to provide evidence as to such bidder's ability to provide adequate assurance of future performance.  Thus, the Debtors have satisfied the statutory requirements for assumption, and the Court should approve the decision to assume the Assigned Contracts as a proper exercise of its respective business judgment.

**E.    The Court Should Approve the Assignment of the Assigned Contracts to the Successful Bidder as the Successful Bidder Can Provide Adequate Assurance of Future Performance**

73.    To assign a contract or lease, a debtor must assume the contract or lease under section 365(b) of the Bankruptcy Code and provide adequate assurance of future performance. 11 U.S.C.  §  365(f)(2).   The Debtors have satisfied the requirements for assumption and assignment pursuant to section 365(f)(2) of the Bankruptcy Code.

74.    First, the Debtors will satisfy the assumption criteria as discussed above at the

Sale Hearing. Second, the financial capability of and willingness to perform the post-assignment obligations under the Assigned Contracts by the Successful Bidder will constitute sufficient "adequate assurance of future performance" to justify the proposed assumption and assignment. See, e.g., In re Tech Hifi, Inc., 49 B.R. 876, 879 (Bankr. D. Mass. 1985) ("Adequate assurance of future performance with respect to the source of rent to be paid means that the proposed assignee has the ability to satisfy the financial obligations imposed by the lease. An absolute guarantee, such as a letter of credit, is not required to meet this standard."); In re PPK Enters., Inc., 235 B.R. 597, 603 (Bankr. E.D. Tex. 1999); In re THW Enters., Inc., 89 B.R. 351, 357 (Bankr. S.D.N.Y. 1988).

75.    Banker Steel will provide information demonstrating that it will have adequate resources to perform on a going forward basis to provide adequate assurance of future performance under the Assigned Contracts. Furthermore, as part of any Qualified Overbid, the prospective purchaser will have to submit evidence of the prospective purchaser financial ability to close the transaction and provide adequate assurances of performance.

76.    In the event there is any objection by a non-debtor party to an Assigned Contract, the Debtors intend to supplement the Sale Motion with further evidence related to the abilities of the prospective bidders to perform under the Assigned Contracts prior to the Sale Hearing.

77.    Accordingly, the Debtors respectfully request that the Court determine that at the time of the Sale Hearing, the Debtors and the Successful Bidder will have complied with the requirements of section 365(f)(2) of the Bankruptcy Code and approve the assumption and assignment of the Assigned Contracts to the Successful Bidder.

**F.    The Sale of the Assets Should Be Free and Clear of Liens, Claims, Encumbrances, and Interests**

78.    Section 363(f) of the Bankruptcy Code provides that the Court may authorize a

sale of property of the estate, "free and clear of any interest in such property of an entity other

than the estate," if:

> (1)     applicable nonbankruptcy law permits sale of such property free and clear of such interest;
>
> (2)     such entity consents;
>
> (3)     such interest is a lien and the price at which such property is to be sold is greater than the aggregate value of all liens on such property;
>
> (4)     such interest is in *bona fide* dispute; or
>
> (5)     such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest.

11 U.S.C. § 363(f); In re General Bearing Corp., 136 B.R. 361, 363-64 (Bankr. S.D.N.Y. 1992).

79.     Banker Steel, as the lender under the Prepetition Loan and the DIP Facility, holds

a first priority security interest in the vast majority of the Debtors' assets.  The Debtors do not

believe they have any other significant secured creditors.  Any holder of a security interest in the

Assets will be served with a copy of the Sale Motion and will be given an opportunity to object.

To the extent that they do not object to the Sale Motion, they should be deemed to have

consented to the proposed Sale under section 363(f)(2) of the Bankruptcy Code.  See, e.g.,

FutureSource, LLC v. Reuters, Ltd., 312 F.3d 281 (7th Cir. 2002), cert. denied, 538 U.S. 962

(2003) (holding that failure to object may constitute consent, if there was adequate notice).

80.     Moreover, pursuant to section 363(f)(5) of the Bankruptcy Code, a free and clear

sale is permissible when the interest holders can otherwise be compelled, in a legal or equitable

proceeding, to accept a money satisfaction of their interests.  11 U.S.C. § 363(f)(5).  See In re

Gulf States Steel, 285 B.R. 497, 508-509 (Bank. N.D. Ala. 2002) (permitting sale free and clear

of a steel mill under section 365(f)(5) over objections where each of the liens or interest could be

compelled to accept a money satisfaction in a cram down plan in chapter 11); see also In re

P.K.R. Convalescent Centers, Inc., 189 B.R. 90 (Bankr. E.D. Va. 1995) (allowing the sale of

nursing home assets under § 363(f)(5) over objection where interest was reducible to a claim and subject to a hypothetical money satisfaction). Importantly, section 363(f)(5) does not require that the sale price for the property must exceed the value of the interests, but rather, only that the mechanism exists to address extinguishing the lien or interest without paying such interest in full. See Gulf States, 285 B.R. at 508.

81.    Because the Debtors expect that they will satisfy one or more of the requirements of section 363(f) of the Bankruptcy Code, as will be demonstrated at the Sale Hearing, approving the Sale of the Assets free and clear of all interests is warranted.

**G.    The Successful Bidder is Entitled to Good Faith Purchaser Status Pursuant to Section 363(m) of the Bankruptcy Code**

82.    As noted above, the Debtors request as part of the approval of the proposed Sale that the Court find that the Successful Bidder is qualified to acquire the Assets and will do so in good faith within the meaning of section 363(m) of the Bankruptcy Code. To be a Qualified Bidder at the Sale Hearing, any potential bidder must provide sufficient financial and other information regarding both the prospective bidder and all other parties participating in the bid to satisfy the Debtors with respect to the requirements enumerated in section 363(m).

83.    Section 363(m) of the Bankruptcy Code provides that "[t]he reversal or modification on appeal of an authorization under subsection (b) or (c) of this section of a sale or lease of property does not affect the validity of a sale or lease under such authorization to an entity that purchased or leased such property in good faith...." 11 U.S.C. § 363(m). Under section 363(m) of the Bankruptcy Code, "an appeal of a bankruptcy court's ruling on a foreclosure action [or sale] generally cannot affect the rights of a good faith purchaser of the foreclosed property, unless the debtor for other complaining party] stays the foreclosure [or other] sale pending an appeal." Mann v. Alexander Dawson, Inc. (In re Mann), 907 F.2d 923, 926 (9th Cir.

1990). "[T]he primary goal of the mootness rule [embodied in section 363(m)] 'is to protect the interest of a good faith purchaser ... of the property,' thereby assuring finality of sales." Onouli-Kona Land Co. v. Estate of Richards (In re Onouli-Kona Land Co.), 846 F.2d 1170, 1173 (9th Cir. 1988) (quoting Community Thrift & Loan v. Suchy (In re Suchy), 786 F.2d 900, 901-02 (9th Cir. 1985)). That goal is important in these cases because the Successful Bidder needs assurance that the purchase of the Assets will not be subject to future attack by objecting creditors. Such assurance is necessary to generate the maximum purchase price for such Assets.

84.    Lack of good faith for purposes of section 363(m) of the Bankruptcy Code is generally determined by the existence of fraudulent conduct or insider dealing during the sale process. See, e.g., In re Exennium, Inc., 715 F.2d 1401 (9th Cir. 1983). In this case no such conduct or dealings have occurred as of the date of the Sale Motion and will not occur prior to the Sale Hearing. All bidders will have to identify each entity that will be participating in such bid, including any proposed designee(s), and provide sufficient financial and other information regarding both the prospective bidder and all other parties participating in the bid to satisfy the Debtors with respect to the requirements enumerated in section 363(m).

85.    The protection of section 363(m) of the Bankruptcy Code is appropriate in these cases because the proposed Sale transaction will be the product of an open auction in Court and, to the extent necessary, arm's-length, good faith negotiations between the Debtors, on the one hand, and the Successful Bidder, on the other.

**H.    The Court Should Waive the Fourteen Day Stay of the Sale Order**

86.    As set forth above, the DIP Facility expires on or about June 14, 2016, and the Debtors will not have the funds to pay their operating expenses after that date unless the proposed Sale closes. If the Sale of the Assets cannot be consummated immediately following the Auction and the Sale Hearing, it is uncertain whether the Debtors can generate sufficient cash

flow to operate. Accordingly, the Debtors request that the automatic fourteen (14) day stay under Bankruptcy Rules 6004(h) and 6006(d) be waived.

I.    **The Manner of Notice and Schedule tor the Bid Deadline and the Auction and Sale Hearing Are Reasonable and Appropriate Under the Circumstances**

87.    The Debtors also respectfully request that the Court approve the manner of notice of the proposed Auction and Sale Hearing. The Debtors submit that this relief will facilitate the Sale process and enable the Debtors to provide interested parties with adequate and sufficient notice of the Auction and related matters.

88.    The Debtors propose to give notice of the Bid Procedures Order, the Auction and the Sale Hearing in the following manner. Within three (3) business days after entry of the Bid Procedures Order (the "Mailing Date"), the Debtors will serve notice of the Auction ("Notice of Auction and Sale Hearing"), substantially in the form attached to the proposed Bid Procedures Order as Exhibit B, and a copy of the Bid Procedures Order, which will contain various dates and deadlines, by first class mail, to those parties identified in the Bid Procedures Order, including (i) the U.S. Trustee; (ii) counsel to any statutory committee of unsecured creditors appointed in these cases, or if no such committee has been appointed, the twenty (20) largest unsecured creditors of each of the Debtors; (iii) counsel to Banker Steel; (iv) the attorneys general for each of the States in which the Debtors conduct operations; (v) all taxing authorities having jurisdiction over any of the Assets, including the Internal Revenue Service; (vi) all parties that have requested or that are required to receive notice pursuant to Bankruptcy Rule 2002; (vii) all parties that are known or reasonably believed to have expressed an interest in acquiring all or a substantial portion of the Assets; (viii) all parties that are known or reasonably believed to have asserted any lien, encumbrance, claim or other interest in the Assets; (ix) all governmental agencies that are an interested party with respect to the Sale and transactions proposed

thereunder; (x) all non-Debtor parties to the Contracts and Leases; and (xi) all other known creditors of the Debtors (collectively, the "Auction and Sale Notice Parties").

89.     In addition, on or before seven days after the entry of the Bid Procedures Order, subject to applicable submission deadlines, the Debtors will publish an abbreviated version of the Notice of Auction and Sale Hearing once in a publication to be determined.

90.     Those parties who desire a copy of the Bid Procedures Order and/or the Stalking Horse Purchase Agreement, and do not receive such papers pursuant to the preceding paragraph, may contact counsel for the Debtors, Tarter Krinsky & Drogin LLP.  The Debtors submit that the foregoing notice is reasonably calculated to provide timely and adequate notice to the Debtors' creditors and other parties in interest, and also to all those who may bid on the Assets. Accordingly, the Debtors submit that such notice constitutes good and sufficient notice under the circumstances with respect to the Sale Motion, all proceedings to be held thereon, and the entry of an order or orders granting all of the relief requested herein.  The Debtors further submit that no further notice need be given.

91.     The Debtors submit that the proposed notice procedures of the Bid Procedures, Auction, Sale Hearing, assumption and assignment of contracts and leases, and all related objection deadlines, comply fully with Bankruptcy Rule 2002 and constitutes good and adequate notice of the Sale.  The Debtors respectfully request that this Court approve the form of Notice of Auction and Sale Hearing, Notice of Assumption and Assignment, and notice procedures proposed above and in the proposed Bid Procedures Order.

## NO PRIOR REQUEST

92.     No previous request for the relief sought herein has been made to this or any other Court.

## NOTICE

93.     The Debtors proposes to serve a Notice of the Motion and all exhibits by hand delivery or overnight delivery upon (i) the Office of the United States Trustee for the Southern District of New York; (ii) each of the Debtors' twenty (20) largest unsecured creditors as set forth on the Debtors' list required by the Bankruptcy Rules; (iii) counsel to Banker Steel, the proposed Stalking Horse Purchaser; and (iv) all parties entitled to notice under Local Rule 2002 (the "Bid Procedures Notice Parties").

94.     The Debtors believe that the foregoing notice procedures to the Bid Procedures Notice Parties, the Auction and Sale Notice Parties and other parties in interest is sufficient to provide effective notice of the Sale Procedures, the Auction and the Sale to potentially interested parties in a manner designed to maximize the chance of obtaining the broadest possible participation while minimizing the costs to the estates.  Accordingly, the Debtors request that the Court find that notice in this manner is sufficient and that no further notice of the Auction or the Sale Procedures is required.

**WHEREFORE**, the Debtor respectfully requests that this Court enter the Bid Procedures Order (attached hereto as **Exhibit "B"**): after a hearing on shortened notice (a) approving the Sale Procedures; (b) scheduling an Auction and Sale Hearing; and (c) approving the Notice of Auction and Sale Hearing. In addition, the Debtor respectfully requests that this Court at the Sale Hearing enter an order: (a) authorizing the Debtor to sell the Assets free and clear of all liens, claims, encumbrances and interests, and (b) approving the Stalking Horse Purchase Agreement. The Debtor further requests that this Court grant such other and further relief as is just and proper.

Dated: New York, New York
January 14, 2016

TARTER KRINSKY & DROGIN LLP
*Attorneys for NYC Constructors, Inc., et al.*
*Debtors and Debtors-in-Possession*


By:    /s/ Arthur Goldstein
       Scott S. Markowitz
       Arthur Goldstein
       Rocco A. Cavaliere
       1350 Broadway, 11th Floor
       New York, New York 10018
       (212) 216-8000
       smarkowitz@tarterkrinsky.com
       agoldstein@tarterkrinsky.com
       rcavaliere@tarterkrinsky.com